UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **FRED H. ANDERTON, JR.,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | **CASE NO. CV 05-B-2638-S** |
| } | |
| **BIRMINGHAM AIRPORT** } | |
| **AUTHORITY,** } | |
| } | |
| **Defendant.** } | |
| } | |

## MEMORANDUM OPINION

This case is currently before the court on defendant Birmingham Airport Authority's ("BAA") Motion for Summary Judgment, (doc. 13).[1] Upon consideration of the record, the submission of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

### I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* At 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.  *See id.* At 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference.  *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

## II.  STATEMENT OF FACTS[2]

On September 23, 2002, Al Denson, Executive Director of the Birmingham Airport Authority ("BAA"), hired plaintiff Fred Anderton as the Director of Operations.

---

[2]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiff, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of plaintiff.  *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).

As Director of Operations, Anderton was the designated Airport Security Coordinator ("ASC"), the point of contact for the Transportation Security Administration ("TSA"), a bureau of the Department of Homeland Security. The function of the ASC is to coordinate and collaborate on security issues at the airport with TSA, and comply with the rules and regulations promulgated by TSA and the Department of Homeland Security. (*Id.*) Collaborating with TSA was an important part of Anderton's job. Collaborating with TSA was also important for security concerns at the airport.

According to Anderton, on three occasions, Denson told Anderton and Walker Johnson (white), Director of the Finance Department, that they would not understand something because "it's a black thing." Anderton also contends Julius Dennis (African-American) was given favorable treatment. According to Anderton, when he talked to Denson about the need for a new maintenance building, Denson told him that the current building was sufficient. On the other hand, when Dennis talked to Denson about the need for a new maintenance bulding, Denson said he would make a new maintenance building a top priority.

Sometime in 2004, Anderton complained about Denson's racial comments to Leslie Murray, the human resources manager. Anderton alleges that, after he had raised concerns about Denson's conduct with Murray, Anderton, Dennis, and Jack Sanford (white) were walking into the VIP room of the airport. According to Anderton, Denson said, "Julius, my man . . .how's it going?" Denson also said, "How's it going Jack?"

3

Denson then looked at Anderton and said, "I've been thinking about getting a new operations director."

Lyndel Hardy was the Federal Security Director, the top local TSA officer. According to Anderton, his relationship with Hardy was "sometimes difficult." On multiple occasions, Hardy complained about the lack of cooperation between TSA and BAA. For example, Hardy complained to Denson that Anderton had interfered with clearing the UAB football team for a chartered aircraft. Anderton admits that BAA had no role in clearing passengers for this charter. Hardy also complained that Anderton had failed to respond to three TSA letters of investigation, which could subject BAA to fines. Anderton contends that he responded to one of the three letters. On May 19, 2004, Hardy contacted Denson with concerns that Anderton was planning a training exercise and intended to exclude TSA from participating. According to the plaintiff, he invited TSA to observe the exercise, but TSA did not participate in the exercise because it was not part of the plan. Hardy requested a meeting to discuss Anderton's continued failure to collaborate with TSA.

In 2004, TSA adopted an amendment that revised the security measures airport operators are required to implement when Homeland Security raises the threat level. These security measures had the potential to significantly impact airport operations. To implement this amendment, BAA was required to partner with TSA to develop and incorporate a TSA-approved Aviation Security Program Contingency Plan

("AVSEC") that addressed security concerns unique to the Birmingham airport. Hardy emphasized to Anderton that it was critical for TSA and BAA to work together on the plan so they were prepared in the event Homeland Security raised the threat level. In October 2004, Hardy sent Anderton a letter about the new amendment, requested Anderton's attendance at an October 22nd meeting to discuss the AVSEC plan, and advised him that the proposed plan had to be completed and in place no later than November 14, 2004.

On November 18, 2004, Denson received a letter from Hardy expressing her frustration at Anderton's refusal to work with TSA on the AVSEC plan and advising him that Anderton did not acknowledge her October letter. When Hardy submitted the plan, he represented in the accompanying report that the plan had been developed with TSA's involvement. Because Anderton had not met with Hardy or made any attempts to collaborate with her, Hardy found this statement "quite disturbing." Hardy refused to approve the plan.

Denson held a meeting on December 6, 2004 to discuss the concerns raised in Hardy's November 18 letter. During the meeting, Hardy informed Denson that Anderton's attitude towards TSA prohibited any efforts of mutual cooperation. Hardy stated that Anderton's uncooperative attitude was such that she could no longer place confidence and trust in Anderton as ASC and that all efforts to repair the relationship and improve communication had been futile. According to Denson, considering Hardy's

position that she would not work with Anderton, Denson was forced to remove him immediately from his ASC role.

Anderton's immediate replacement was Jack Sanford (white), one of Anderton's subordinates. However, Anderton contends his former roles were shared by Sanford and Julius Dennis (African-American), with Dennis taking the role of Maintenance Director, and Sanford taking the role of Operations Director.

### III.  DISCUSSION

Anderton alleges that BAA discriminated against him on the basis of race in violation of Title VII. Anderton also alleges that BAA retaliated against him for his complaints of discrimination. A plaintiff may establish a claim of illegal disparate treatment through either direct evidence or circumstantial evidence. *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999).

Because Anderton has not presented direct evidence of discrimination or retaliation, the court uses the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). When the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate,

nondiscriminatory reason for its actions. *See Combs*, 106 F.3d at 1528. "If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

**RACE DISCRIMINATION CLAIM**

**Prima Facie Case**

To establish a prima facie case of race discrimination, Anderton must establish that: 1) he is a member of a protected class; 2) he was qualified; 3) he was subjected to an adverse employment action; and 4) he was replaced by a person outside his protected class or treated less favorably than a similarly situated individual outside his protected class. *Maynard v. Board of Regents the Division of Universities of the Florida Department of Education*, 342 F.3d 1281, 1289 (11th Cir. 2003).

It is undisputed that Anderton was a member of a protected class (white) and was subjected to an adverse employment action when he was terminated on December 10, 2004. BAA argues that Anderton was not qualified, and was not replaced by a person outside his protected class or treated less favorably than a similarly situated individual outside his protected class.

BAA contends that Anderton was not qualified because "after TSA refused to recognize plaintiff as ASC and work with him on security matters, [he] was no longer

qualified for his position." According to BAA, the "ability to cooperate and work harmoniously with the TSA was an essential function of his position as Director of Operations and designated ASC." BAA argues that plaintiff "could not, or would not, fulfill this responsibility," and that it "had to replace [Anderton] as point of contact [with TSA]."

"[T]o demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769 (11th Cir. 2005). Considering Anderton was hired for the position, and performed it for a period of time, he was objectively qualified. BAA argues that, once Anderton had irreparably damaged his relationship with TSA, he was no longer qualified. However, it is at least possible that, had BAA wanted, it could have attempted to repair Anderton's relationship with TSA. Therefore, for purposes of this summary judgment motion, the court will consider that plaintiff was qualified for the position.

BAA also argues that Anderton was not replaced by an individual outside the protected class, and was not treated less favorably than a similarly situated employee outside the protected class. Anderton has not presented evidence that he was treated less favorably than a similarly situated non-Caucasian employee. Whether or not Anderton was replaced by an individual outside his protected class depends on whether he was replaced by Sanford (white) or Sanford and Dennis (African-American). Anderton

creates an issue of fact that, after his termination, his former roles were shared by Sanford and Dennis, with Dennis taking the role of Maintenance Director, and Sanford taking the role of Operations Director. Therefore, Anderton has established a prima facie case.

**Articulated Reason**

Because Anderton has established a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for its actions. "The defendant's burden of rebuttal is exceedingly light." *Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983). "[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons[;] it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* (quoting *Burdine*, 450 U.S. at 254-55). "At this stage of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is 'merely one of production, not proof.'" *Id.* (quoting *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982)).

Denson's termination letter summarizes BAA's articulated, nondiscriminatory reason for terminating Anderton. Denson notified Anderton that "[s]ince the ability to effectively work with TSA is a significant part of your job, and I have had to replace you as the point of contact, with subordinate members of your staff, your effectiveness as a department head has been diminished."

It is undisputed that two functions of the ASC are to coordinate and collaborate on

9

security issues with TSA and comply with the rules and regulations promulgated by TSA and the Department of Homeland Security. Therefore, working cooperatively with TSA was an important part of Anderton's job.

Anderton admits that within a few months of his hire his relationship with TSA officials, including Lyndel Hardy, TSA Federal Security Director, was sometimes difficult. Hardy complained about the lack of cooperation between TSA and BAA on several occasions.

For example, Hardy complained when Anderton argued with TSA officials about the re-screening of certain charter flight passengers.[3] In March 2004, Hardy complained to Denson that Anderton had failed to respond to three TSA letters of investigation, which had the potential to subject BAA to fines.[4] Plaintiff admits that he occasionally, in front of BAA employees, criticized the decisions of TSA officials. On May 19, 2004, Hardy contacted Denson because Anderton was planning a training exercise and intended to exclude TSA from participation.

According to BAA, the final straw was when Anderton failed to cooperate with TSA in implementing the Aviation Security Program Contingency (AVSEC) plan. In 2004, TSA adopted an amendment that revised the security measures airport operators are

---

[3] Anderton admits it was within TSA's authority to re-screen passengers and that BAA had no role in screening passengers for the charter.

[4] Anderton contends that TSA did not receive a response to only two letters. Regardless of whether TSA did not receive two responses, or three, the incident is an example of Anderton at the center of discord between BAA and TSA.

required to implement when Homeland Security raises the threat level. In order to implement this amendment, it was necessary that BAA and TSA work in partnership in developing the AVSEC plan.  In October 2004, Hardy wrote Anderton requesting Anderton's attendance at a meeting on October 22 to discuss the AVSEC plan.   On November 18, 2004, Denson received a letter from Hardy complaining about Anderton's refusal to work with the TSA on the AVSEC plan, his failure to acknowledge her October letter, his failure to appear for their meeting on October 22, his failure to collaborate with her on the AVSEC plan, and his late submission of the plan.[5]   Hardy was also disturbed by the contents of the plan.  In the AVSEC plan, Anderton represented that it had been developed with TSA's involvement even though Anderton had not actually met with Hardy or her staff regarding the project.  Hardy refused to approve the plan.

On December 6, 2004, Hardy met with Anderton and Denson to discuss Hardy's November 18, 2004 letter.   Hardy informed Anderton and Denson that "Anderton's uncooperative responses and approach towards TSA prohibited any efforts of mutual cooperation in addressing security issues at the Birmingham Airport." Hardy also "advised Mr. Denson that Mr. Anderton's recent written claims stating that he had cooperatively worked with TSA on the AVSEC plan were so egregious that [she] could no longer place confidence and trust in Mr. Anderton as Airport Security Coordinator."

---

[5]According to Anderton, he was unable to submit the plan on the date due of November 14, 2004, because of a death in his family.  He attempted to submit it the following day, but there was no one in the TSA office to receive it.  He turned in the plan to the TSA office on November 16, 2004.

Finally, she "noted that many meetings and discussions had taken place to improve relationships and communications, but the results remained the same."

As a result of the December 6, 2004 meeting, Denson removed Anderton from the position of ASC and placed Sanford in that role. According to Denson, he replaced Anderton with Sanford in order to ensure that "the government-mandated ASC position remained occupied and security issues would not be further compromised." Denson then determined that he "could not retain Mr. Anderton in any position for which he was qualified given his adversarial relationship with TSA."

Through evidence of Anderton's inability or unwillingness to cooperate with TSA, a crucial component of his job, BAA has articulated a legitimate, nondiscriminatory reason for Anderton's termination. Therefore, the burden shifts to Anderton to establish that BAA's articulated reason is actually a pretext for illegal discrimination.

**Pretext**

Anderton attempts to show BAA's articulated reason is a pretext for illegal discrimination by arguing that: 1) BAA overstates the conflict between Anderton and TSA, and 2) Denson treated Anderton differently from African-American employees such as Dennis.

According to Anderton, "[BAA] has overstated the difficulties between [Anderton and TSA], which were capable of resolution . . . [and] marshals whatever dissatisfaction those working with Anderton might have had with him and presents a demonized picture

12

of the fired employee." However, even Anderton's Response in Opposition to Defendant's Motion for Summary Judgment characterizes the relationship between Anderton and TSA as "sometimes difficult." Anderton admits that he had disagreements with Hardy, and the undisputed evidence shows that Anderton's relationship with TSA deteriorated to the point that Hardy contacted Denson several times complaining of Anderton's lack of cooperation. In a letter to Denson, Hardy complained that Anderton did not attend an important meeting and failed to consult TSA in creating the AVSEC plan. She also stated that she found the plan's assertion that TSA and BAA worked together in creating the plan "quite disturbing."

Anderton also alleges that Denson demonstrated racial animus by stating, "it's a black thing," giving preferential treatment to Dennis, an African-American employee, and implying that he intended to terminate Anderton. According to Anderton, on approximately three occasions, Denson said to Anderton, "you all wouldn't understand, it's a black thing."[6] Anderton stated that the comment was made when Denson was reminiscing about the past. Anderton does not explain how Denson referring to certain things from his past as being "black thing[s]" is evidence of racial animus. Even if, on one occasion, the comment was made with regard to a complaint by an employee that Anderton did not understand, the evidence does not rise to the level necessary to establish

---

[6]Walker Johnson was a witness to one of the three occasions. Johnson recalled, "Denson was reminiscing about his childhood and how they would eat or prepare 'whitning fish.'" Johnson was not familiar with the term and Denson informed him that it was probably "a black cultural thing." Johnson never heard Denson make racially inappropriate comments.

pretext.

Anderton claims that Denson's willingness to take up the cause of Dennis and promote him rapidly, and to eventually replace Anderton with Dennis, is evidence of racial animus and discrimination." Anderton also alleges that Denson once stated, "I'd been thinking about getting a new operations director," after looking at Anderton. However, even if Anderton's allegations are true, there is no evidence that the alleged favoritism or comment had any relationship to race. Therefore, these circumstances do not create a meaningful inference that BAA's reason for terminating Anderton is a pretext for unlawful discrimination based on plaintiff's race, and summary judgment is due to be granted as to Anderton's discrimination claim.

**RETALIATION CLAIM**

**Prima Facie Case**

To establish a prima facie case of retaliation, a plaintiff must establish that: 1) he engaged in statutorily protected activity; 2) there was a subsequent adverse employment action; and 3) that some causal relationship exists between the protected expression and the adverse action. *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994).

Anderton cannot establish the first element of his prima facie case. To engage in statutorily protected activity, a plaintiff must show that he had "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United*

*Technologies, Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).  "[A] plaintiff's burden under this standard has both a subjective and an objective component." *Id.*  "A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented." *Id.*

It is undisputed that Anderton complained to Human Resources about his working environment.  Anderton complained that: 1) on three occasions, while reminiscing about the past, Denson said: "It's a black thing, you would not understand"; 2) on three or four occasions, during discussions of local politics, Denson said: "If you don't want to listen to this you can leave"; and 3) once, when Anderton was with Dennis and Sanford, Denson greeted Dennis and Sanford, but looked at Anderton and said: "I've been thinking about getting a new operations director."

Although Anderton "need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a prima facie case," he must show "that he had a reasonable belief that the employer was engaged in unlawful employment practices." *Little*, 103 F.3d at 960.  Even assuming that Anderton believed he was opposing an unlawful employment practice, his belief was not objectively reasonable.

One of Anderton's complaints has absolutely nothing to do with race.  Anderton alleges that Denson greeted Sanford and Dennis, but not Anderton.  However, Sanford is white.  Therefore, Denson's failure to greet Anderton does not imply racial animus.

Furthermore, assuming Denson stated that he was thinking about replacing Anderton, Anderton has not produced any evidence connecting that statement to his race.

Anderton also fails to explain how Denson's alleged statement that Anderton could leave if he did not want to hear the conversation about politics is evidence of racial animus. At most, it suggests that Denson was involved in a sensitive political discussion about issues that were not related to work, and informed Anderton that he could leave if he did not want to hear, or was somehow offended by, the discussion. Anderton does not allege that he was forced to leave, or even that he was asked to leave.

Denson's comment — "It's a black thing, you wouldn't understand" — is clearly related to race, but does not in any way indicate racial animus. According to Anderton, the comment was made on three occasions. On two of those occasions, Denson was merely reminiscing. Anderton fails to offer any evidence connecting Denson's reminiscing to racial animus. On the third occasion, Anderton alleges that Denson and two other employees were discussing a complaint that "had something to do with what [one of the operators] had said versus what [one of the supervisors] had said." Anderton stated, "I don't understand why that's a problem, but I'll take care of it." According to Anderton, Denson responded, "Well you wouldn't understand it[,] [i]t's a black thing." This comment is Anderton's best evidence. However, even when considered with all the other evidence as a whole, this incident could not sustain an objectively reasonable belief that Anderton was the victim of unlawful discrimination so sufficiently severe or

pervasive as to alter the conditions of his employment and create an abusive working environment. *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11 th Cir. 1999) (noting that the belief must be measured against the substantive law at the time of the offense).

Anderton did not engage in protected activity because the conduct he complained of could not support a reasonable belief that he had been subjected to a hostile work environment. Therefore, he cannot establish a prima facie case of retaliation, and his claim fails as a matter of law. Plaintiff fails to establish a prima facie case for a second independent reason. There is no evidence before the court on which a reasonable jury could find that the decision-maker Denson knew of plaintiff's complaints to Human Resources. Thus, plaintiff cannot prove the third element of his prima facie case, that is, a causal connection between the protected activity and the adverse action.

**Articulated Reason**

Even assuming Anderton established a prima facie case, BAA has articulated a legitimate, nondiscriminatory reason for his termination. Undisputed evidence shows that cooperation with TSA was an important part of Anderton's job, that Anderton had a difficult relationship with TSA, and that Hardy complained about Anderton on several occasions. As a consequence of Anderton's inability to effectively cooperate with TSA, BAA terminated Anderton.[7]

---

[7]BAA's nondiscriminatory reason for terminating Anderton is discussed in greater detail above.

**Pretext**

Anderton has not offered sufficient evidence to establish that BAA's articulated reason is a pretext for unlawful discrimination.[8]  Consequently, even assuming he engaged in protected expression, his retaliation claim fails as a matter of law.

### IV.  CONCLUSION

Therefore, upon careful review of the record and the arguments presented in the briefs of the parties, the court concludes that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

Done this 24th day of September, 2007.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

---

[8] Anderton offers the same evidence of pretext as he did with regard to his termination claim.  Anderton's evidence of pretext is also discussed more fully above.